[No. 35483-3-I.   Division One.   September 11, 1995.]

DAVIS RICHMOND, *Respondent*, v. WOODROW THOMPSON, ET AL., *Appellants*.

---

[7]*See also Villella v. Public Employees Mut. Ins. Co.*, 106 Wn.2d 806, 821, 725 P.2d 957 (1986).

*William R. Bishin,* for appellants.

*Christine O. Gregoire, Attorney General,* and *Steven L. Abel, Assistant;* and *Christopher K. Vick,* for respondent.

*Delwen A. Jones, Sharon L. Rosse, Traci A. Sammeth, Paul C. De Vore,* and *Bruce E.H. Johnson,* amici curiae.

BAKER, C.J. — Dr. Woodrow Thompson appeals from a

jury verdict in favor of Washington State Patrol Trooper Davis Richmond in Trooper Richmond's action for defamation. Dr. Thompson contends (1) his complaints about Trooper Richmond to various public officials and agencies should be absolutely privileged under state and federal constitutional guaranties and under the common law, (2) a law enforcement officer's action for defamation should require proof of actual physical or pecuniary injury, (3) each element of such an action must be proven by clear and convincing evidence, and (4) Trooper Richmond failed to establish actual malice by clear and convincing evidence. We affirm, holding that Dr. Thompson's allegations were not absolutely privileged under the state or federal petition clauses, that Dr. Thompson's common law absolute privilege and actual injury arguments have not been preserved for appeal, that actual malice is the only element of a public official defamation action which must be proven by clear and convincing evidence, and that the evidence supports the jury's verdict in favor of Trooper Richmond.

Trooper Richmond cross-appeals, contending the trial court erred in granting Dr. Thompson's motion for summary judgment dismissing his claims for malicious prosecution and outrage. We affirm, holding that there has been no "prosecution" which supports an action for malicious prosecution and that the dismissal of Trooper Richmond's outrage claim is moot.

## FACTS

Trooper Richmond stopped the Thompsons for speeding on Highway 2 near Leavenworth. He told Dr. Thompson that the radar indicated he had been traveling at sixty-seven miles per hour (in a fifty-five-mile-per-hour zone). Dr. Thompson insisted that this was impossible because his cruise control was set at fifty-five. When Trooper Richmond persisted in writing a citation, Dr. Thompson became very angry and accused Trooper Richmond of trying to meet a ticket quota. Dr. Thompson eventually

signed the ticket and drove away. A short time later, however, he turned around and returned to the area where he had been ticketed.

By this time, Trooper Richmond had stopped another car and was in his patrol car writing the driver, Eric Hanson, a ticket. Dr. Thompson parked his car in front of Hanson's vehicle and walked back to talk to Hanson. Hanson said he had been speeding and refused Dr. Thompson's invitation to join in a lawsuit against Trooper Richmond. When Trooper Richmond saw Dr. Thompson talking to Hanson, the trooper returned to the Hanson vehicle.

What happened next is in dispute. Trooper Richmond, Hanson, and Hanson's passenger testified that Trooper Richmond forcefully told Dr. Thompson to leave, and that Dr. Thompson left only after being told that he would be arrested for obstructing an officer if he continued to interfere. Dr. Thompson, on the other hand, testified that Trooper Richmond pushed him and threatened to shoot him.

Dr. Thompson did not mention these allegations when he appeared in district court on the infraction. Dr. Thompson said he could not have been speeding because he had set his cruise control at fifty-five. The judge found the infraction had occurred. Dr. Thompson then retained counsel who appealed the infraction to superior court. The case was remanded to district court for a retrial. Both Trooper Richmond and Dr. Thompson testified at the retrial before a different judge. Dr. Thompson again denied speeding but did not claim that Trooper Richmond pushed or threatened him. The court again found that the infraction had occurred.

Shortly before the retrial, Dr. Thompson discussed his case with Sharon Tucker at the Governor's office of Constituent Affairs. Dr. Thompson told Tucker that Trooper Richmond had assaulted him and threatened to blow his head off. Dr. Thompson sent a letter to the Governor's office relating the same allegations and stating that he was pressing charges against Trooper Richmond

for assault and attempted murder. Dr. Thompson sent copies of these letters to the Chelan County prosecutor and the district court judge. He later wrote to the prosecutor demanding that Trooper Richmond be prosecuted for assault and attempted murder.

Dr. Thompson's allegations were brought to the attention of the State Patrol, which conducted an internal investigation. After interviewing the several witnesses to the incident, the investigating officers determined that Dr. Thompson's charges were unfounded.

Trooper Richmond then brought this action against Dr. Thompson, alleging, inter alia, defamation, malicious prosecution, and outrage. Dr. Thompson counterclaimed, alleging violations of the Thompsons' civil rights and various torts, including assault. The trial court granted Dr. Thompson's motion for summary judgment on Trooper Richmond's outrage and malicious prosecution claims. The court denied a motion to dismiss the defamation claim, rejecting Dr. Thompson's arguments that his complaints were absolutely privileged based upon the constitutional right to petition for redress found in both the federal and state constitutions.

The court's defamation instruction required Trooper Richmond to prove that Dr. Thompson's letter to the Governor's office was false, was defamatory per se, was communicated to a third party, caused damage to Trooper Richmond, and was published with actual malice.[1] Both Dr. Thompson's proposed instruction and the instruction actually given to the jury required Trooper Richmond to prove the first four elements by a preponderance of the evidence and the actual malice element by clear and convincing evidence. Another instruction provided that if the jury found for Trooper Richmond on his defamation claim, the jury should presume that Trooper Richmond suffered damages.  .

---

[1]Trooper Richmond pleaded his defamation claim based upon only the communications to the Governor's office. Consequently, only these communications were argued to the jury as a basis for the defamation claim.

The jury rejected all of Dr. Thompson's cross-claims, found in Trooper Richmond's favor on his defamation claim, and awarded him $15,000. These appeals followed.

## Dr. Thompson's Appeal

In *New York Times Co. v. Sullivan*[2] the Supreme Court formulated the familiar "actual malice" standard which requires public figures to establish that a defamation defendant made the defamatory statement with knowledge of falsity or with reckless disregard for whether it was false or not. The parties do not dispute that Trooper Richmond is a public figure for purposes of the *New York Times* standard, insofar as Dr. Thompson's allegations relate to Trooper Richmond's official conduct.[3] The *New York Times* standard was applied to the present case by the instruction which required the jury to find actual malice in order to find for Trooper Richmond on his defamation claim.

On appeal Dr. Thompson and amici curiae argue for a departure from *New York Times* and recognition of an absolute privilege barring defamation actions by law enforcement officers against citizen complainants. Dr. Thompson contends the qualified privilege created by *New York Times* does not adequately protect the constitutional interests at stake in complaints of police misconduct, and that the *New York Times* standard permits a chilling effect which is unjustified in the context of citizen complaints to a proper government agency. Dr. Thompson also suggests the public interest in protecting citizens who complain about official misconduct is stronger than the interest in protecting other forms of expression, and that police officers have "dangerous incentives" to bring unfounded defamation claims against citizen complainants. Dr. Thompson suggests an absolute privilege may be

---

[2]*New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686, 95 A.L.R.2d 1412 (1964).

[3]*See Tilton v. Cowles Publishing Co.*, 76 Wn.2d 707, 716-17, 459 P.2d 8 (1969), *cert. denied*, 399 U.S. 927 (1970).

based on the petition clauses of the federal and Washington constitutions or on the common law.

We share Dr. Thompson's grave concerns about lawsuits which are based on citizen complaints to the appropriate government agency concerning official misconduct. However, we are constrained to rule that the constitutional protection afforded to such complaints is not absolute. We also rule that Dr. Thompson has not preserved his common law absolute privilege argument for this appeal.

## I

■ ■ Dr. Thompson's argument for an absolute privilege based on the Petition Clause of the First Amendment would require this court to distinguish the Supreme Court's decision in *McDonald v. Smith*.[4] In *McDonald*, a candidate for the position of United States Attorney brought a libel action against the defendant for making maliciously false allegations in letters to the President and other federal officers.[5] The Supreme Court rejected the defendant's argument that the Petition Clause in the First Amendment created an absolute privilege. Instead, the Court observed that "[t]he right to petition is cut from the same cloth as the other guarantees of [the First] Amendment[.]"[6] The court held that the Petition Clause did not require expansion of the qualified privilege recognized by *New York Times*.[7] Following *McDonald*, Dr. Thompson's allegations were not absolutely privileged under the federal Petition Clause.

Dr. Thompson's efforts to distinguish *McDonald* are unpersuasive. He points out that *McDonald* did not involve the police and that the plaintiff was not a public official. The plaintiff was, however, a public figure. We observe

---

[4]*McDonald v. Smith*, 472 U.S. 479, 105 S. Ct. 2787, 86 L. Ed. 2d 384 (1985).

[5]*McDonald*, 472 U.S. at 481-82.

[6]*McDonald*, 472 U.S. at 482 (citing *United States v. Cruikshank*, 92 U.S. (2 Otto) 542, 23 L. Ed. 588 (1875).

[7]*McDonald*, 472 U.S. at 485.

that a United States Attorney is a more prominent law enforcement official than a state trooper. Constitutional concerns for protecting public criticism of a person being considered for that office are at least as great as for allegations concerning the conduct of a state trooper. Dr. Thompson also suggests the defendant's letters went to persons and agencies not involved in the selection process.[8] Nothing in the *McDonald* opinion indicates this factor was significant. Dr. Thompson's observation that the defendant in *McDonald* was petitioning the federal as opposed to state government is a distinction without an apparent difference.

Amicus American Civil Liberties Union of Washington Foundation (ACLU) contends *McDonald* should be read to govern only petitions involving matters of broad political interest. ACLU suggests an individual's interest in a particular wrong may not generate public interest or support and that the chilling effect of the threat of civil liability is greater in such cases. Such fine distinctions are not supported by the facts of *McDonald*. While the appointment of a United States Attorney is a matter of public concern, nothing in the *McDonald* opinion suggests the defendant's particular allegations generated any public interest or support. *McDonald* permitted an action for libel to go to trial and therefore cannot be distinguished from the present action by any absence of a threat of civil liability.

*McDonald* is not distinguishable from the present facts and is therefore dispositive. Dr. Thompson's allegations were not absolutely privileged under the federal Petition Clause.

## II

■ Dr. Thompson alternatively contends the Washington Petition Clause, Const. art. I, § 4, provides an absolute privilege. The dispositive issue is whether the Washington constitution provides greater protection than the parallel provision in the federal constitution, as interpreted in *Mc-*

---

[8]The letters were sent to the President, his Presidential Advisor, elected members of Congress and the director of the FBI—all concerned parties in the appointment of a United States Attorney. *McDonald*, 472 U.S. at 481 nn.1-2.

*Donald.* The starting point for an independent interpretation of our state constitution is an analysis of the *Gunwall*[9] factors.

> The following nonexclusive neutral criteria are relevant in determining whether, in a given situation, the Washington State Constitution should be considered as extending broader rights to its citizens than the United States Constitution: (1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern.

*Gunwall*, 106 Wn.2d at 58.

■ Dr. Thompson's argument is based entirely on differences in the wording of the Washington Petition Clause.[10] Const. art. I, § 4 provides: "The right of petition and of the people peaceably to assemble for the common good shall never be abridged." The First Amendment preserves "the right of the people peaceably to assemble, and to petition the government for a redress of grievances." Many provisions in the Declaration of Rights are worded differently than their parallel federal provisions. In the absence of any indication (normally provided by analysis of the other four *Gunwall* factors) of why the difference was intended to be material, Const. art. I, § 4 will be interpreted in harmony with the First Amendment.[11]

---

[9]*State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986).

[10]Dr. Thompson has cited no relevant constitutional history, no preexisting state law and no matters of particular local concern. With respect to the fifth *Gunwall* factor, Dr. Thompson points out, without analysis, that our supreme court has noted:

> [S]tructural differences between the state and federal constitutions . . . will always point toward pursuing an independent state constitutional analysis because the federal constitution is a grant of power from the states, while the state constitution represents a limitation of the State's power.

*State v. Young*, 123 Wn.2d 173, 180, 867 P.2d 593 (1994) (citing *State v. Smith*, 117 Wn.2d 263, 286, 814 P.2d 652 (1991) (Utter, J., concurring); *Gunwall*, 106 Wn.2d at 66).

[11]Finally, Dr. Thompson suggests potential abuses of an absolute right to petition may be curtailed by insisting on "good faith" petitioning. This argument makes little sense—an absolute privilege which is limited by a requirement that

## III

Dr. Thompson contends his allegations are absolutely privileged under Washington common law, but this argument was not made to the trial court. Apart from presenting the public policy considerations which favor such a privilege, this issue is not well briefed by Dr. Thompson on appeal. ACLU contends Dr. Thompson's letter to the Governor's office was absolutely privileged as preliminary to a quasi-judicial proceeding.[12] This theory has considerable merit.[13]

In *Story v. Shelter Bay Co.*, 52 Wn. App. 334, 338-39, 760 P.2d 368 (1988), this court held that alleged defamatory statements in complaints to the Department of Housing and Urban Development and the State Department of Licensing concerning a real estate developer's misdeeds were absolutely privileged. Such communications are absolutely privileged in " 'situations in which authorities have the power to discipline as well as strike from the record statements which exceed the bounds of permissible conduct.' "[14] The privilege extends to communications made prior to the commencement of such proceedings.[15] ACLU contends the Governor's office acts as a conduit for citizen complaints which are then routed to the State Patrol and that the State Patrol has adequate safeguards to prevent the abuse of an absolute privilege.

■ Assuming, arguendo, Dr. Thompson's letter to the

the petition not be undertaken solely to harass an adversary is not absolute. Furthermore, Dr. Thompson simply assumes his behavior would survive such a restriction. The evidence would support a determination that his letter was intended to injure or harass Trooper Richmond.

[12]The appellate courts normally do not decide issues raised only by amici. *State v. Clark*, 124 Wn.2d 90, 101, 875 P.2d 613 (1994).

[13]Although the plaintiff in *McDonald v. Smith, supra*, prevailed on remand to the district court, the circuit court of appeals reversed, holding that the defendant's statements were absolutely privileged under North Carolina common law. *Smith v. McDonald*, 713 F. Supp. 871 (M.D.N.C. 1988), *rev'd*, 895 F.2d 147 (4th Cir. 1990), *cert. denied*, 498 U.S. 814 (1991).

[14]*Story*, 52 Wn. App. at 338 (quoting *Twelker v. Shannon & Wilson, Inc.*, 88 Wn.2d 473, 476, 564 P.2d 1131 (1977)).

[15]*Story*, 52 Wn. App. at 340-41.

Governor would be absolutely privileged, it is not at all clear whether the letters to the prosecutor and the court would be similarly privileged. *Story* refused to extend the absolute privilege to statements made in complaints to the Consumer Protection Division of the State Attorney General's Office because that agency lacked the necessary authority to safeguard against abuse of an absolute privilege.[16] As Dr. Thompson points out, Trooper Richmond's defamation claim was based solely on Dr. Thompson's letter to the Governor. Consequently, Trooper Richmond was seriously prejudiced by Dr. Thompson's failure to raise this issue at a point in the proceedings in which Trooper Richmond could amend his complaint. Because Dr. Thompson failed to raise this issue in a timely fashion and because it raises unresolved questions of fact, we refuse to consider this issue for the first time on appeal.[17]

## IV

■ Dr. Thompson contends the trial court erred in giving a defamation jury instruction which required Trooper Richmond to prove only actual malice by clear and convincing evidence and all other elements by a preponderance of the evidence. Dr. Thompson proposed the very language to which he now objects. Although we question whether this court should review an issue which presents an almost invited error,[18] we reject Dr. Thompson's argument on the merits.

■ Dr. Thompson relies on an unfortunate statement of

---

[16]*Story*, 52 Wn. App. at 339.

[17]RAP 2.5(a). This common law argument does not raise constitutional issues. RAP 2.5(a)(3).

[18]Trooper Richmond relies on *Tilton*, 76 Wn.2d at 720, for the proposition that instructions which are not excepted to at the trial level become the law of the case. Dr. Thompson suggests RAP 2.5(a)(3) supersedes *Tilton* in permitting review of manifest constitutional errors on appeal. In *Haueter v. Cowles Publishing Co.*, 61 Wn. App. 572, 577 n.4, 811 P.2d 231 (1991) this court determined that a claim that the trial court had applied an incorrect standard of proof under the First Amendment was an issue affecting fundamental constitutional rights and would be considered for the first time on appeal.

the law in *Herron v. King Broadcasting Co.*[19] Reversing a grant of summary judgment to a defamation defendant in a case governed by the actual malice standard, the *Herron* court cited the Supreme Court's opinion in *Anderson v. Liberty Lobby, Inc.*[20] for the proposition that "[a]ll the elements of defamation must be shown with convincing clarity."[21] *Anderson* in fact applied the clear and convincing evidence standard only to the element of actual malice.[22]

In *Haueter*, this court recognized and clarified the discrepancy between *Anderson* and earlier Washington cases.

> In the United States Supreme Court defamation cases, the evidentiary standard of convincing clarity has been applied only to the issue of fault, and then only where the standard is actual malice: "the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands . . .", *New York Times [Co. v. Sullivan]*, 376 U.S. [254,] 285-86[, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964)]; "clear and convincing proof of 'actual malice' ", *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984); "a showing of *New York Times* malice is subject to a clear and convincing standard of proof", *Milkovich v. Lorain Journal Co.*, [497] U.S. [1], 111 L. Ed. 2d 1, 110 S. Ct. 2695, 2703-04 (1990).
>
> Neither the common law nor the First Amendment, as interpreted by the United States Supreme Court, requires proof of any element of a defamation action, other than actual malice, by evidence of convincing clarity.

*Haueter*, 61 Wn. App. at 581-82.[23] The instruction given by

---

[19]112 Wn.2d 762, 776 P.2d 98 (1989).

[20]477 U.S. 242, 255-56, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

[21]*Herron*, 112 Wn.2d at 768.

[22]*Anderson*, 477 U.S. at 255-56.

[23]*See also Ernst Home Ctr., Inc. v. United Food & Commercial Workers, Int'l*, 77 Wn. App. 33, 43 n.8, 888 P.2d 1196 (1995).

the trial court correctly applied the clear and convincing evidence standard to only the element of actual malice.

## V

■ Dr. Thompson contends the evidence does not establish actual malice by clear and convincing evidence. Dr. Thompson and amicus Allied Daily Newspapers of Washington, Inc., contend this court must exercise its independent judgment and determine whether the evidence in the record establishes actual malice under the clear and convincing standard.[24] We have reviewed the record, particularly the important testimony of the eyewitnesses, and are satisfied that the jury's verdict rests upon constitutionally sufficient evidence.

In his letter to the Governor's office, Dr. Thompson specifically alleged that Trooper Richmond unclipped his pistol and began threatening to "blow [his] brains out." The testimony of Trooper Richmond, Hanson, and Hanson's passenger, Hahler, clearly and convincingly establish that nothing of the sort occurred. This fact, coupled with Dr. Thompson's anomalous failure to make these allegations until more than six months had elapsed and after he had failed to convince the first district court that he had not been speeding, supports a reasonable inference that Dr. Thompson knew his allegations about Trooper Richmond were false.

Dr. Thompson's arguments to the contrary are entirely factual. First, Dr. Thompson suggests Trooper Richmond's case was based on only self-serving testimony of interested parties and weak circumstantial evidence. The characterization of the testimony of the eyewitnesses as "weak circumstantial evidence" is not at all accurate. Hahler, for

---

[24]*See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984).

example, clearly testified that the alleged acts did not occur.[25]

■ Dr. Thompson also suggests that even if the allegations were false, the jury could still have found that Dr. Thompson believed they were true. Dr. Thompson contends Trooper Richmond's actions may have created such fear and stress as to distort Dr. Thompson's perceptions and that those perceptions were a rational interpretation of ambiguous events. Both arguments are entirely factual. Both ignore the possibility that the jury may have instead drawn the more reasonable inference that nothing even remotely resembling Dr. Thompson's allegations occurred and that he fabricated the allegations because he was angry about his speeding ticket.

Dr. Thompson, in effect, argues for a rule that in this context the self-interested testimony of an accused law enforcement officer should be ignored. We refuse to apply a separate, disadvantageous rule of evidence to the

---

[25]Hahler testified:

Q: Did you see Trooper Richmond touch Dr. Thompson at all during this time?

A: No.

Q: Were you in a position where you could have seen that if that had occurred in front of you?

A: Yes.

. . . .

Q: Did you see at any time when you were watching him, did he unclip his gun?

A: No.

Q: Were you in a position to have seen that if that had occurred?

A: Yes.

Q: Did Trooper Richmond take his hands and push Dr. Thompson on his shoulders?

A: No.

Q: Were you in a position to see that if that had occurred?

A: Yes.

testimony of law enforcement officers in this context. Such a rule would permit a citizen to make the most outrageously false allegations of misconduct with impunity as long as there were no other witnesses to the encounter.

## VI

Dr. Thompson contends a law enforcement officer's action for defamation should require proof of the officer's actual or pecuniary injury. This argument has not been preserved for appeal.[26] In the alternative, Dr. Thompson suggests the instruction constitutes an error of constitutional magnitude, reviewable on appeal pursuant to RAP 2.5(a)(3). Dr. Thompson contends, without applicable authority to support him, that a presumption of damages has an impermissible chilling effect on constitutional rights to free speech and to petition the government. In the absence of compelling legal authority to support it, this argument does not raise a constitutional issue which we are inclined to consider for the first time on appeal.

## VII

We reject Dr. Thompson's remaining assignments of error. In a footnote, Dr. Thompson contends it was error for the trial court to refuse his requested instruction on substantial truth. This assignment of error is unsupported by argument or authority.

Although Instruction 9 placed the burden of proof of all elements of defamation, including actual malice, on Trooper Richmond, the court also gave Instruction 12, which provided:

---

[26]Instruction 13 directed the jury to presume Trooper Richmond had suffered damages if it found for him on his defamation claim. Dr. Thompson may not appeal an instruction he requested. *In re Griffith*, 102 Wn.2d 100, 102, 683 P.2d 194 (1984). Dr. Thompson contends the instruction was offered only after the trial court rejected his motion for summary judgment on the defense of absolute privilege. This argument erroneously implies that the language of the instruction was somehow compelled by the trial court's disposition of his arguments relating to absolute privilege. Dr. Thompson did not make this argument on summary judgment, and the trial court never ruled on it.

It is a defense to a claim of defamation that the Defendant, in good faith, communicated a complaint or information to any agency of federal, state or local government regarding any matter reasonably of concern to that agency. The Defendant has the burden of proving this defense by a preponderance of the evidence.

(Emphasis added.) This instruction was apparently based on RCW 4.24.510. ACLU contends this instruction improperly allocated the burden of proof to Dr. Thompson, contrary to *Gilman v. MacDonald*, 74 Wn. App. 733, 738-39, 875 P.2d 697, *review denied*, 125 Wn.2d 1010 (1994). Dr. Thompson does not raise this issue. We will not consider issues raised only by amici.[27]

Dr. Thompson assigns error to the verdict against his assault claim. In his opening brief, Dr. Thompson does not explain why the evidence required the jury to find that Trooper Richmond assaulted him—an issue on which Dr. Thompson had the burden of proof. In his reply brief, Dr. Thompson suggests he would rather waive this issue than have the court devote undue attention to it. We reject, on the merits, this purely factual challenge to the jury's verdict.

### Trooper Richmond's Cross-Appeal

### VIII

Trooper Richmond contends the trial court erred in dismissing his claim for malicious prosecution. He contends the investigation which resulted from Dr. Thompson's allegations constituted a prosecution for purposes of his claim of malicious prosecution under RCW 4.24.350. We disagree.

(1) *In any action for damages*, whether based on tort or contract or otherwise, a claim or counterclaim for damages may be litigated in the principal action for malicious prosecution on the ground that the action was instituted with knowledge that the same was false[.]

---

[27]*See* note 12.

(2) In any action, claim, or counterclaim brought by a judicial officer, prosecuting authority, or law enforcement officer for malicious prosecution . . ., an arrest or seizure of property need not be an element of the claim, nor do special damages need to be proved.

(Emphasis added.) RCW 4.24.350. Trooper Richmond's argument is based on language from uncodified legislative findings in support of 1984 amendments to RCW 4.24.350. Subsection (2) (above) was added by Laws of 1984, ch. 133, § 2, in which the Legislature found:

[A] growing number of unfounded lawsuits, *claims*, and liens are filed against law enforcement officers, prosecuting authorities, and judges, and against their property, having the purpose and effect of deterring those officers in the exercise of their discretion and inhibiting the performance of their public duties.

The legislature also finds that the cost of defending against such unfounded suits, claims and liens is severely burdensome to such officers, and also to the state and the various cities and counties of the state. The purpose of section 2 of this 1984 act is to provide a remedy to those public officers and to the public.

(Emphasis added.) Trooper Richmond assumes, with little analysis and no authority, that RCW 4.24.350(2) creates a cause of action for malicious prosecution which does not require an underlying civil action against the officer. We hold that the ambiguous reference to "claims" in the uncodified legislative findings does not supercede the threshold requirement of "an action for damages" in RCW 4.24-.350(1).[28]

In *Imig v. Ferrar*, 70 Cal. App. 3d 48, 138 Cal. Rptr. 540 (1977), relied on by Trooper Richmond, a police officer brought an action for malicious prosecution against a citizen whose complaints of police misconduct led to an

---

[28]The court in *Keates v. City of Vancouver*, 73 Wn. App. 257, 268, 869 P.2d 88, *review denied*, 124 Wn.2d 1026 (1994), noted "our Legislature has attempted to discourage lawsuits [against police officers] by enacting RCW 4.24.350, which allows law enforcement officers to counterclaim against those who institute malicious prosecution actions against them."

investigation of the officer. The court noted that an action for malicious prosecution could be based on administrative proceedings. However,

> a mere investigation which does not lead to the initiation of proceedings before an administrative board having power to take action adversely affecting plaintiff's legally protected interests is not a sufficient basis upon which to found a malicious prosecution action under [California law].

*Imig*, 138 Cal. Rptr. at 545. The record does not indicate how far the investigation proceeded in this case. Trooper Richmond and other witnesses were interviewed by an investigator who prepared a report, but the State Patrol apparently took no further action. Without more, these facts do not establish a legally adequate claim of malicious prosecution even assuming administrative proceedings are sufficient. The trial court did not err in dismissing Trooper Richmond's claim for malicious prosecution.

## IX

Trooper Richmond assigns error to the trial court's summary judgment dismissal of his claim for outrage. Trooper Richmond could recover damages for outrage only if he had not recovered his emotional distress damages under another tort theory.[29] Trooper Richmond concedes he has not been actually prejudiced by the dismissal of his outrage claim. Whether the trial court improperly dismissed the outrage claim is moot.

Affirmed.

BECKER and Cox, JJ., concur.

Review granted at 128 Wn.2d 1023 (1996).

---

[29]*See Rice v. Janovich*, 109 Wn.2d 48, 61-62, 742 P.2d 1230 (1987).