922 P.2d 1343 (1996)
130 Wash.2d 368
Davis RICHMOND, Respondent,
v.
Woodrow THOMPSON and Jane Doe Thompson, whose true Christian name is unknown, husband and wife, and the marital community composed thereof, Petitioners.
No. 63541-2.
Supreme Court of Washington, En Banc.
Argued May 15, 1996.
Decided September 26, 1996.
*1345 William R. Bishin, Inc., PS, William R. Bishin, Seattle, WA, for Petitioners.
Christopher K. Vick, Mark L. Lorbiecki, Renton, WA, Will Aitchison, Portland, OR, for Respondent.
Davis, Wright & Tremaine, P. Cameron De Vore, Bruce E. Johnson, Seattle, WA, Delwen Jones, Washington, DC, Perkins, Coie, Traci A. Sammeth, Alice D. Leiner, Graham & Dunn, Sharon L. Rosse, Lembhard Howell, Mills, Meyers & Sartling, Frederick M. Meyers, Daniel R. Laurence, Seattle, WA, Amicus Curiae.
*1344 JOHNSON, Justice.
This is a defamation case in which we are asked to decide whether citizen complaints regarding police conduct are absolutely privileged under either the federal and state constitutions or common law. Washington State Patrol Trooper Davis Richmond sued Thompson for defamation on the basis of a letter Thompson sent to the Governor's Office. In the letter, Thompson alleged Trooper Richmond assaulted him and threatened to "blow his head off" following a routine traffic stop. A jury awarded Trooper Richmond $15,000, and the Court of Appeals affirmed. In addition, Thompson challenges the jury verdict on the basis of insufficient evidence of actual malice. Thompson also challenges the trial court's jury instructions. We affirm.

FACTS
Trooper Richmond stopped Thompson for speeding and cited him for going 67 miles *1346 per hour in a 55-mile-per-hour speed zone on State Route 2 near Leavenworth. Although Thompson insisted his cruise control was set at 55 or 57, he eventually signed the ticket and drove away.
A short time later, Thompson returned to the area where he had been stopped and noticed that Trooper Richmond had pulled over another car. Thompson approached the driver of that car, Eric Hanson, while Trooper Richmond was in his patrol car writing Hanson a ticket. Thompson told Hanson he thought the trooper's radar was defective and asked Hanson if he felt he deserved the ticket. Hanson said he had been speeding and refused Thompson's invitation to protest the ticket with him. When Trooper Richmond saw Thompson talking to Hanson, he immediately returned to Hanson's car.
Trooper Richmond testified he told Thompson in a very stern voice to move away from Hanson's car and commanded him to leave the area or he would be arrested. Trooper Richmond says he never touched Thompson or threatened to shoot or kill him but did tell him:
[I]f you think you are going to follow me around and hound me and butt into each contact, you are wrong.
....
[O]n any stop I make, that person may step out with a gun. If they do and you are parked in front of me, I could never return fire without fear of hitting you, which means I can't stop cars as long as you keep butting in.
Report of Proceedings (Nov. 8, 1993) at 30-40.
Thompson testified that while he was talking with Hanson, Trooper Richmond yelled at him to "quit interfering with [his] stop" and then pushed him on the shoulder two or three times and said something to the effect, "I ought to blow your brains out." Thompson explained:
I felt him push me two or three times in the shoulder. There seemed to be a long pause. He was just staring at me, just very, very angry, and then it just seemed like an eternity, at least for the moment anyway, and then he reached down somewhere near his side, got this most awful look on his face and said something to the effect, `I ought to blow your brains out.'
Report of Proceedings-B (Nov. 9, 1993) at 75.
Neither Hanson nor his passenger, Patricia Hahler, heard Trooper Richmond threaten Thompson or see Trooper Richmond push Thompson. But Hanson testified the situation was very tense, and that when Trooper Richmond returned to Hanson's car, he "squared off" with Thompson and instructed Thompson to step away from the car "in a verbally forceful manner." Dep. of Hanson at 11. Hanson further explained:
You know, as best, what I can say there is it was very loudly spoken, very forcefully spoken, aggressively spoken. It was such that he approached Dr. Thompson at my car. And what I do recall is him verbally leading him back or forcing him back from my vehicle within, you know, inches from each other's face. So basically he was, approached him face to face and was verbally instructing him to step back from the car.
Dep. of Hanson at 12.
Following the incident, Thompson unsuccessfully challenged the infraction in Chelan County, both in District and Superior Court. In both proceedings the judge found the infraction had occurred. Thompson did not mention the alleged touching or threat at the hearing in either proceeding, arguing only that he could not have been speeding because his cruise control had been set at 55.
During the Chelan County proceedings, Thompson contacted Sharon Tucker at the Governor's Office for Constituent Affairs. Thompson told Tucker that Trooper Richmond threatened to "blow his head off." Thompson sent a letter to Tucker relating the same allegation:
Upon turning around, we saw that he had stopped another motorist, so, seeing no harm in it, I decided to stop and ask the other motorist if he felt he was doing the speed Richmond was accusing him of. I got out of my car and walked back to the other car, to ask the other motorist his opinion. Richmond, whose car was behind *1347 the motorist, jumped out of his car and rushed toward me, and began accusing me of interfering with his stop; he was very angry and began pushing me backwards toward my car and unclipped his pistol and began threatening to `blow my brains out.'... Richmond only backed off his threat to shoot me after I pointed out he would have to kill my wife and the other motorist if he didn't want any witnesses. He continued to push me, now threatening to take me in and book me on unspecified charges.... I wish to file assault and attempted murder charges against this man.... This man almost costed [sic] me my life and I intend to see that justice is rendered.[[1]]
Pls.' Ex. 3.
Tucker brought Thompson's allegations to the attention of the State Patrol, which conducted an internal investigation to determine whether Trooper Richmond's conduct was unbecoming or unprofessional. The investigating officer determined that Thompson's charges were unfounded and closed the investigation less than one month after it had been initiated. The State Patrol took no further action with regard to Thompson's complaint.
Trooper Richmond filed this action in July 1990, alleging defamation, malicious prosecution, and outrage.[2] Thompson counterclaimed, alleging violations of the Thompsons' civil rights and various torts, including assault. The trial court granted Thompson's motion for summary judgment on Trooper Richmond's outrage and malicious prosecution claims. The court denied a motion to dismiss the defamation claim, rejecting Thompson's argument that his letter was absolutely privileged based upon the right to petition under the federal and state constitutions.
Following three days of testimony, the jury rejected all of Thompson's cross claims, found in Trooper Richmond's favor on his defamation claim, and awarded him $15,000. Both parties appealed to this court. This court transferred the appeal to Division One of the Court of Appeals. Division One affirmed in Richmond v. Thompson, 79 Wash. App. 327, 901 P.2d 371 (1995). We granted Thompson's petition for review.

ANALYSIS

Absolute Privilege
Thompson and amicus curiae American Civil Liberties Union of Washington (ACLU-W) ask this court to recognize an absolute privilege under the First Amendment, the Washington Constitution and common law barring defamation actions by police officers against citizens who complain to appropriate agencies about the conduct of police officers. They contend that the New York Times Co. v. Sullivan[3] qualified privilege is inadequate in a case like this because individual complaints to public agencies about police misconduct implicate constitutional interests far more important than the constitutional interests at stake in criticism of other public officials. We are not persuaded that an absolute privilege is constitutionally mandated and, therefore, hold the trial court did not err in applying the New York Times qualified privilege. We will not review Thompson's claim for a common law absolute privilege because this issue was not raised at trial.
First Amendment
New York Times Co. v. Sullivan ushered in a new era in which courts recognized the need to protect some false statements under the First Amendment. Before New York Times, courts held individuals strictly liable for defamatory statements, attributing no constitutional value to false statements. Under the law as it existed in this state before New York Times and the law currently *1348 applied to private individuals, Trooper Richmond would have to prove Thompson negligently made a defamatory statement that caused damages. Taskett v. KING Broadcasting Co., 86 Wash.2d 439, 445, 546 P.2d 81 (1976).
New York Times, however, established a qualified privilege under the First Amendment for statements concerning public officials. Under this qualified privilege, a public official cannot recover for defamation unless he or she establishes the defendant made the defamatory statement with actual malice, that is, knowledge of its falsity or with reckless disregard for whether it was false or not.[4]New York Times, 376 U.S. at 283, 84 S.Ct. at 727-28. Underlying this rule is the recognition that a rule that protects only the right to utter the truth chills protected speech. The Court explained that some false statements are protected because:
A rule compelling the critic of official conduct to guarantee the truth of all his factual assertionsand to do so on pain of libel judgments virtually unlimited in amount leads to a comparable `self-censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which `steer far wider of the unlawful zone.' The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments.
New York Times, 376 U.S. at 279, 84 S.Ct. at 725-26 (footnote omitted) (citations omitted) (quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)); see generally Laurence H. Tribe, American Constitutional Law § 12-12 at 864 (2d ed.1988).
Both parties agree Trooper Richmond is a public official under New York Times. Thompson, however, argues that when the statement concerns a police officer, the privilege needs to be broader than the New York Times qualified privilege because of the public official's status as a police officer. Thompson offers several reasons for an absolute privilege based on the public official's status as a police officer: (1) the importance of public criticism in controlling police conduct, (2) the knowledge and power of police officers, and (3) the substantially diminished interest in protecting officers' reputations where a complaint is directed to an appropriate agency.
Thompson has cited no authority that supports giving heightened First Amendment protection to citizens who complain of police conduct. In the numerous reported cases involving public officials, the federal courts have shown no interest in drawing constitutional distinctions on the basis of the status of the public official involved. See, e.g., Herbert v. Lando, 441 U.S. 153, 169-70, 99 S.Ct. 1635, 1645-46, 60 L.Ed.2d 115 (1979). And, in the numerous reported cases involving police officers, the courts have applied the New York Times qualified privilege, implicitly recognizing police officers' legitimate interest in protecting their reputations. Reed v. Northwestern Publishing Co., 124 Ill.2d 495, 506-09, 125 Ill.Dec. 316, 530 N.E.2d 474 (1988); McKinley v. Baden, 777 F.2d 1017, 1021 (5th Cir.1985); Gray v. Udevitz, 656 F.2d 588, 591 (10th Cir.1981); see also Bruce W. Sanford, Libel and Privacy § 7.2 n. 110 (2d ed. 1993 Supp.) (cases collected). There are no degrees of public officials warranting application of different constitutional protection. Therefore, we will not recognize an absolute privilege under the speech clause of the First Amendment.
Similarly, we are not persuaded that the petition clause of the First Amendment is *1349 a basis for affording Thompson an absolute privilege. In McDonald v. Smith, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985), the Supreme Court considered and flatly rejected the argument that the petition clause provides greater protection than the speech clause. In McDonald, a candidate for the position of United States Attorney brought a libel action against the defendant for making maliciously false allegations in letters to the President and other federal officers. The defendant argued that when a citizen communicates directly with the government about matters of public concern, the petition clause requires the court to accord an absolute privilege to such communication rather than the New York Times qualified privilege. McDonald, 472 U.S. at 481-82, 105 S.Ct. at 2789-90. The Court rejected this argument, stating "[t]he right to petition is cut from the same cloth as the other guarantees of [the First] Amendment." McDonald, 472 U.S. at 482, 105 S.Ct. at 2789. It explained that the petition clause was never intended to provide absolute liability for defamation:
To accept petitioner's claim of absolute immunity would elevate the Petition Clause to special First Amendment status. The Petition Clause, however, was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble. These First Amendment rights are inseparable, and there is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions.
McDonald, 472 U.S. at 485, 105 S.Ct. at 2791 (citations omitted).
Thompson asks this court to distinguish McDonald on the basis that: (1) McDonald did not involve the police; (2) the plaintiff was a public figure, not a public official; (3) the complaint was not sent to a specific agency set up to investigate such complaints; (4) some of the letters were sent to people who were not part of the selection process; (5) the defendant did not seek redress of a particular grievance; and (6) the communication related to federal, not state government. The ACLU-W also argues McDonald should be read to govern only petitions involving matters of broad political interest.
Nothing in McDonald suggests that these distinctions are of constitutional magnitude. The core concern in McDonald was whether there was a textual or historical basis for distinguishing between the petition and speech clauses. The nature of the communication, to whom it was sent, and the status of the parties played no part in the Court's decision. As a result, the proper standard under the petition clause must be the New York Times qualified privilege. See Miner v. Novotny, 304 Md. 164, 167-69, 498 A.2d 269 (1985) (under nearly identical facts, holding no absolute privilege under petition clause and overruling prior cases to the contrary on the basis of McDonald.)
Here, Thompson's letter was qualifiedly privileged under the First Amendment. For the reasons stated previously, we will not depart from the New York Times standard.
Washington Constitution
Thompson alternatively argues the Washington petition clause, Const. art. I, § 4, affords greater protection than the First Amendment in the form of an absolute privilege to petition government.
We analyze the following nonexclusive neutral criteria in determining whether the Washington State Constitution should be interpreted independently of the United States Constitution: (1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern. State v. Gunwall, 106 Wash.2d 54, 58, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Although Thompson's Gunwall analysis is incomplete, amicus ACLU-W has presented a factor-by-factor analysis, and the Court of Appeals analyzed the State Constitution.
1. Language of the Washington Constitution
Similar to the federal constitution, the State Constitution declares the right of the people to petition and speak freely. Const. art. I, § 4 provides: "The right of petition *1350 and of the people peaceably to assemble for the common good shall never be abridged." Const. art. I, § 5 provides: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."
Thompson and the ACLU-W argue the use of the "being responsible" language in art. I, § 5 and absence of such language in art. I, § 4 shows the framers intended a qualified right for free speech but no such qualification on the right to petition. Thompson and amicus ACLU-W, however, overlook the "for the common good" language in art. I, § 4. This language does qualify the right to petition. See State v. Gossett, 11 Wash.App. 864, 527 P.2d 91 (1974) (right to petition is subject to reasonable limitations). And, in this case, recklessly made false statements are not in the common good. As such, this factor does not support the result urged by Thompson.
2. Textual Differences
While Const. art. I, § 4 differs from the First Amendment in that Const. art. I, § 4 contains the word "never," this difference is nominal and does not support Thompson's argument.
3. State Constitutional and Common Law History
The historical roots of the right to petition can be traced to the Magna Carta and the Declaration of Rights of 1689. Carter v. University of Washington, 85 Wash.2d 391, 398, 536 P.2d 618 (1975), overruled on other grounds by, Ford Motor Co. v. Barrett, 115 Wash.2d 556, 800 P.2d 367 (1990). The right to petition, like the other rights contained in the First Amendment and the Declaration of Rights to the Washington Constitution, is accorded a "paramount and preferred place in our democratic system." Pacific Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal.3d 1118, 1133 n. 15, 791 P.2d 587, 270 Cal.Rptr. 1 (1990) (quoting City of Long Beach v. Bozek, 31 Cal.3d 527, 532, 645 P.2d 137, 183 Cal.Rptr. 86 (1982), vacated and remanded, 459 U.S. 1095, 103 S.Ct. 712, 74 L.Ed.2d 943 (1983)). Nonetheless, the history of the right to petition does not support the argument for an absolute privilege. Criminal and civil liability for defamation were well established in 1889. State v. Mays, 57 Wash. 540, 107 P. 363 (1910); see also Lando, 441 U.S. at 158, 99 S.Ct. at 1639-40 (civil and criminal liability for defamation well established at common law). Thompson and amicus ACLU-W have not presented any authority that the framers of our constitution intended the petition clause to limit defamation actions as they existed at common law. As such, this factor does not support Thompson's argument.
4. Preexisting State Law
In 1889, the common law of defamation prevailed in this state. See Mays, 57 Wash. at 542-43, 107 P. 363. The common law zealously protected the reputations of individuals, capturing "without discrimination the calculated lie and the error made in honest belief of its truth." Joel D. Eaton, The American Law of Defamation Through Gertz v. Robert Welch, Inc. And Beyond: An Analytical Primer, 61 Va. L.Rev. 1349, 1360 (1975). Courts, however, reluctantly recognized a limited number of absolute and qualified privileges on the basis of the competing value of protecting the free flow of ideas. See State v. Wilson, 137 Wash. 125, 241 P. 970, 43 A.L.R. 1263 (1925). By the early part of this century, this court had established an absolute privilege for pleadings and statements made during the course of judicial proceedings and had recognized a qualified privilege for matters concerning the "administration of government." Wilson, 137 Wash. at 129-31, 241 P. 970.
While this court recognized a number of privileges early on, it plainly believed the First Amendment and Const. art. I, § 5 did not grant absolute immunity. Wilson, 137 Wash. at 133, 241 P. 970. In Haffer, for example, this court upheld the libel conviction of a man who had authored an article "tending to expose the memory of George Washington to hatred, contempt and obloquy." State v. Haffer, 94 Wash. 136, 137, 162 P. 45 (1916). This court rejected the defendant's argument that his statements were protected under Const. art. I, § 5, stating:
We are quite unable to appreciate an argument which suggests that any one has a *1351 constitutional right to maliciously defame the memory of a deceased person, though such person's memory lives only in history, any more than to maliciously defame a living person.
Haffer, 94 Wash. at 143, 162 P. 45. In Wilson this court refused to give absolute constitutional protection to the statements made to a county clerk in a petition to recall the city attorney. Wilson, 137 Wash. at 134, 241 P. 970. Thus, early state law did not attribute any protection to false statement.[5] This factor, like the others we have discussed, does not support Thompson's argument.
5. Differences in Structure Between the Federal and State Constitutions
This factor always favors an independent state interpretation. State v. Russell, 125 Wash.2d 24, 61, 882 P.2d 747 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995).
6. Matters of Particular State Interest or Local Concern
This factor supports an independent interpretation of the right to petition as it relates to police misconduct because of the state's particular concerns in law enforcement matters.
Although the fifth and sixth factors support Thompson's argument, the Gunwall factors as a whole do not support the interpretation of Const. art. I, § 4 that Thompson urges. As a result, in this case, we interpret Const. art. I, § 4 consistent with the First Amendment. Other jurisdictions that have considered this issue have reached similar conclusions. See Harris v. Adkins, 189 W.Va. 465, 432 S.E.2d 549 (1993); Doe v. Alaska Superior Court, 721 P.2d 617 (Alaska 1986); Arlington Heights Nat'l Bank v. Arlington Heights Fed. Sav. & Loan Ass'n, 37 Ill.2d 546, 229 N.E.2d 514 (1967).
Common Law Privilege
Thompson and amici[6] next ask this court to recognize a common law absolute privilege for citizen complaints concerning police conduct.[7] The Court of Appeals found this theory had considerable merit but refused to reach the merits of the issue because Thompson "failed to raise this issue in a timely fashion and because it raise[d] unresolved questions of fact." Richmond, 79 Wash.App. at 338, 901 P.2d 371.
In prior cases, the Court of Appeals has extended the absolute common law privilege to the investigatory phase of a quasi-judicial proceeding. Story v. Shelter Bay Co., 52 Wash.App. 334, 760 P.2d 368 (1988). And, other jurisdictions have recognized a common law absolute privilege in circumstances similar to this case. See Miner v. Novotny, 304 Md. 164, 498 A.2d 269 (1985) (recognizing an absolute privilege for a citizen's complaint against a law enforcement officer); Gray v. Rodriguez, 481 So.2d 1298 (Fla.Dist.Ct.App. 1986) (complaint to internal review panel concerning alleged police misconduct absolutely *1352 privileged); Putter v. Anderson, 601 S.W.2d 73 (Tex.Civ.App.1980) (citizen's complaints of police misconduct were absolutely privileged); Campo v. Rega, 79 A.D.2d 626, 433 N.Y.S.2d 630, 631 (N.Y.App.Div.1980), appeal denied, 52 N.Y.2d 705, 437 N.Y.S.2d 1028, 419 N.E.2d 876 (1981). Thompson did not raise this issue at trial and is not entitled to review of this issue as it does not raise a question of constitutional magnitude. As such, there is no basis for considering this issue for the first time on appeal. RAP 2.5(a).

Jury Instruction 9
Thompson and amicus curiae Allied Daily Newspapers of Washington challenge the trial court's jury instruction requiring Trooper Richmond to prove only actual malice by clear and convincing evidence and all other elements by a preponderance of the evidence.[8] They claim the actual malice standard applies to all of the elements of a defamation action. Trooper Richmond argues this issue was not preserved for appeal because Thompson proposed the language in the instructions at issue and did not object to them.
Because Thompson proposed the language in the jury instruction he now objects to and did not object to it at trial, we must first decide whether it can be challenged for the first time on appeal. The Court of Appeals rejected Thompson's argument on the merits, although it questioned whether it should "review an issue which presents an almost invited error." Richmond, 79 Wash.App. at 338, 901 P.2d 371.
Instructions not objected to at trial become the law of the case and will not be considered on appeal absent, among other things, a "manifest error affecting a constitutional right." RAP 2.5(a). In Haueter v. Cowles Publishing Co., 61 Wash.App. 572, 577 n. 4, 811 P.2d 231 (1991), the court determined a claim that the trial court had applied an incorrect standard of proof under the First Amendment was an issue affecting fundamental constitutional rights and would be considered for the first time on appeal. Assuming Haueter was correctly decided and applied in this case, we reach the merits of this issue.
Thompson relies on Herron v. KING Broadcasting Co., 112 Wash.2d 762, 776 P.2d 98 (1989), where this court, reversing summary judgment in favor of a defamation defendant in a case governed by the actual malice standard, cited Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986) for the proposition that "[a]ll the elements of defamation must be shown with convincing clarity." Herron, 112 Wash.2d at 768, 776 P.2d 98. As the Court of Appeals in this case pointed out, Anderson in fact applied the clear and convincing evidence standard only to the element of actual malice. Anderson, 477 U.S. at 255-56, 106 S.Ct. at 2513-14.
In Haueter, the Court of Appeals clarified the discrepancy between Anderson and Herron, stating in defamation cases the United States Supreme Court has applied the convincing clarity standard "only to the issue of fault, and then only where the standard is actual malice," and "[n]either the common law nor the First Amendment, as interpreted by the United States Supreme Court, requires proof of any element of a defamation action, other than actual malice, by evidence of convincing clarity." Haueter, 61 Wash.App. at 582, 811 P.2d 231; see also Ernst Home Ctr., Inc. v. United Food & Commercial Workers Intern. Local 1001, 77 Wash.App. 33, 43 n. 8, 888 P.2d 1196 (1995) ("Haueter is persuasive" that the clear and convincing standard only applies to malice); Lee v. The Columbian, Inc., 64 Wash.App. *1353 534, 537 n. 2, 826 P.2d 217 (1991) (recognizing discrepancy).
The authority relied on by the Court of Appeals in Haueter supports the conclusion that the instruction given by the trial court correctly applied the clear and convincing evidence standard only to the element of actual malice.
Amicus curiae Allied Daily Newspapers' contention that Mark v. Seattle Times, 96 Wash.2d 473, 635 P.2d 1081 (1981), cert. denied, 457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339 (1982) and Margoles v. Hubbart, 111 Wash.2d 195, 760 P.2d 324 (1988), require a different result is misplaced. Mark held a defamation plaintiff resisting a defense motion for summary judgment must establish a prima facie case by evidence of convincing clarity on the basis of "policy reasons, rooted in the First Amendment, for an early testing of plaintiff's evidence." Mark, 96 Wash.2d at 487, 635 P.2d 1081.
Anderson rejects the idea that the First Amendment demands the application of a higher evidentiary standard when the court considers summary judgment in a defamation action. Rather, the court must be guided by the evidentiary standards that apply to the case. Anderson, 477 U.S. at 255, 106 S.Ct. at 2513-14. Thus, as the Court of Appeals concluded, the jury instruction on this issue properly stated the law.

Can Trooper Richmond Recover For Defamation Absent "Concrete" Evidence Of Special Damages?
Thompson's next argument is that "a peace officer's SLAPP suit[9] cannot be justified under constitutional principles unless at minimum he pleads and proves concrete, objectively verifiable special damage." [10] Br. of Appellant at 69. Thompson frames this as a constitutional argument, recognizing that this alleged error was not preserved for appeal, having not been raised at trial. In re Griffith, 102 Wash.2d 100, 102-03, 683 P.2d 194 (1984). The Court of Appeals did not consider this issue under RAP 2.5(a) because Thompson failed to offer "compelling legal authority to support" his argument "that a presumption of damages has an impermissible chilling effect on" First Amendment rights. Richmond, 79 Wash. App. at 342, 901 P.2d 371. Because the United States Supreme Court has held states may permit juries to presume damages in defamation actions upon a showing of actual malice, Thompson has failed to raise a federal constitutional issue. See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761, 105 S.Ct. 2939, 2946, 86 L.Ed.2d 593 (1985); Gertz v. Robert Welch, Inc., 418 U.S. 323, 349, 94 S.Ct. 2997, 3011-12, 41 L.Ed.2d 789 (1974). As a result, we will not review this issue.[11]

Sufficient Evidence Of Actual Malice
Finally, Thompson asks this court to overturn the jury verdict on the basis the trial evidence does not establish actual malice by clear and convincing evidence.
To prevail at trial, Trooper Richmond had to show by clear and convincing evidence that at the time Thompson wrote to Tucker in the Governor's Office, he in fact had serious doubts as to the truth of whether Trooper Richmond touched him, unclipped his gun, and threatened to blow his brains out.
In New York Times, the Supreme Court said it would make an independent examination of the record "so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." New York Times, 376 U.S. at 285, 84 S.Ct. at 729 (footnote omitted); accord Bose Corp. v. Consumers Union, 466 *1354 U.S. 485, 510-11, 104 S.Ct. 1949, 1964-65, 80 L.Ed.2d 502 (1984); Tilton v. Cowles Publishing Co., 76 Wash.2d 707, 720, 459 P.2d 8 (1969), cert. denied, 399 U.S. 927, 90 S.Ct. 2238, 26 L.Ed.2d 792 (1970). In reviewing a defamation case on appeal, then, this court must make an independent examination of the record to determine whether there is sufficient evidence of actual malice.
The actual malice standard is subjective in the sense that it focuses on the defendant's knowledge that the statement is false or made with reckless disregard of its falsity. Margoles, 111 Wash.2d at 200, 760 P.2d 324. Thompson argues the evidence could not establish actual malice as a matter of law because: (1) Trooper Richmond's actions could have caused anyone in Thompson's position to interpret the events as Thompson did, (2) Thompson's statements are a rational interpretation of ambiguous actions and therefore not actionable, and (3) Thompson's version of the events are not inherently improbable.
Clear and convincing evidence was presented that Trooper Richmond did not push Thompson or unclip his weapon. Hanson and Hahler, who had clear views of Thompson and Trooper Richmond, testified they did not see Trooper Richmond touch Thompson or unclip his weapon. Based on this direct evidence, a reasonable juror could have inferred that Thompson knew Trooper Richmond did not touch him or unclip his weapon.
Also, clear and convincing evidence was presented that Trooper Richmond did not threaten to blow Thompson's brains out. The jury obviously gave great weight to Trooper Richmond's testimony. A reviewing court should respect credibility choices made by the factfinder even in defamation cases involving independent review. See Bose, 466 U.S. at 510, 104 S.Ct. at 1964-65. From this and the fact Thompson did not mention this allegation until after he lost in district court more than six months after the incident, a reasonable juror could have believed Thompson made this allegation with actual malice.
Trooper Richmond has assigned error to the trial court's dismissal of his malicious prosecution and outrage claim on summary judgment in his brief to this court.[12] However, these issues were not raised in Thompson's petition for review, and Trooper Richmond did not raise them in his answer to the petition for review. As such, these issues are not before this court. RAP 13.7(b).
We affirm the trial court and Court of Appeals in all respects.
DURHAM, C.J., and GUY, MADSEN, TALMADGE and SANDERS, JJ., concur.
DOLLIVER, Justice, dissenting.
I dissent. I accept Defendant Woodrow Thompson's letter merited only a qualified privilege under federal and state constitutional protections of his freedom of speech. See New York Times Co. v. Sullivan, 376 U.S. 254, 283, 84 S.Ct. 710, 727-28, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964). I dispute the majority's analysis of Defendant's right to petition under Article I, Section 4, of the Washington Constitution. Our state constitution unambiguously guarantees its citizens the absolute privilege to petition the government. The trial court erred by denying Defendant's defense of absolute privilege, and this court should reverse.
This court looks first to state constitutional protections before resorting to the Federal Constitution. Collier v. City of Tacoma, 121 Wash.2d 737, 745-46, 854 P.2d 1046 (1993); Alderwood Assocs. v. Washington Envtl. Council, 96 Wash.2d 230, 237-38, 635 P.2d 108 (1981). The majority's discussion of the First Amendment right to petition, questionably expanding the qualified privilege identified in the factually distinguishable McDonald v. Smith, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985), is unnecessary. Even assuming the majority accurately portrays the holding of McDonald, our parallel state provision assures independent and broader protection of Defendant's right to petition the government.
*1355 As the majority concedes, our state constitution may afford broader protection than parallel federal provisions where an independent basis for interpretation exists. State v. Gunwall, 106 Wash.2d 54, 61-62, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Yet the majority then negates this principle by misapplying the oft-quoted "Gunwall factors" as a mechanical test of six mandatory elements. Majority at 1349-51; see Gunwall, 106 Wash.2d at 58, 720 P.2d 808. To the contrary, Gunwall by its own terms, explicitly providing "nonexclusive" and "neutral" factors "relevant" for comparing state and federal constitutional provisions, functions simply as a guide to the exercise of judicial discretion. Gunwall, 106 Wash.2d at 58, 720 P.2d 808. The court need not fulfill every or anyGunwall factor to justify a broader reading of a parallel state constitutional provision. Gunwall, 106 Wash.2d at 58, 720 P.2d 808.
In the present case, Gunwall clearly endorses treatment of Article I, Section 4, as independent from the First Amendment right to petition. To aid identification of a broader state provision, Gunwall deems relevant both differences between texts and textual language. Gunwall, 106 Wash.2d at 58, 720 P.2d 808. These factors exhort our affirmation of the greater protection of our state citizens' right to petition.
Article I, Section 4, indisputably differs textually from the First Amendment:
The right of petition and of the people peaceably to assemble for the common good shall never be abridged.
Const. art. I, § 4 (emphasis added).
Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.
U.S. Const. amend. I. Only superficial or spurious interpretation could produce the majority's description of these textual differences as "nominal." Majority at 1350. The term "never" carries profound meaning central to the provision, and its inclusion we cannot so lightly dismiss.
The text of Article I, Section 4, unambiguously directs an absolute privilege. The majority somehow interprets "never" to mean "sometimes." Where a constitutional provision contains such plain and unambiguous language, however, we are not free to seek further interpretation. See, e.g., State ex rel. Anderson v. Chapman, 86 Wash.2d 189, 191, 543 P.2d 229 (1975). "Never" means never.
Noticeably, where the drafters intended a qualified right, they so indicated in equally clear language. The right to assemble clause includes the conditionals "peaceably" and "for the common good," allowing reasonable restraint of that guaranty. See Const. art. I, § 4; see also State v. Gossett, 11 Wash.App. 864, 527 P.2d 91 (1974). The right to petition, on the other hand, lacks any such qualifiers.
Fundamental to liberty and democracy is the right to petition the government for redress of grievances. See Alderwood Assocs., 96 Wash.2d at 239-40, 635 P.2d 108. This right bears particular import where the grievance concerns the activities of government officials and seeks satisfaction from the appropriate agency. By misreading our state constitution the majority has closed off this vital avenue of communication between the state and its citizens.
Equally surprising, the unfounded limitation on the right of the individual will generate the exact effect the majority purports to avoid: publication of possibly erroneous allegations against government officials. Lacking the deserved protection of Article I, Section 4, to pursue discreet redress via petition of government agency, Defendants only recourse would lie in the much more public and potentially damaging lawsuit.
ALEXANDER and SMITH, JJ., concur.
NOTES
[1] Thompson sent copies of this letter to the Chelan County Prosecuting Attorney and the district court judge who presided over the first hearing. Thompson later wrote to the prosecutor demanding that Trooper Richmond be prosecuted for assault and attempted murder.
[2] Trooper Richmond's defamation claim was based entirely upon the communications to the Governor's Office, although his counsel prepared the case under the mistaken belief that the complaint put all of the letters at issue.
[3] 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964).
[4] Justice Goldberg and Justice Black, joined by Justice Douglas, argued for an absolute privilege under the First Amendment. New York Times, 376 U.S. at 293, 84 S.Ct. at 733 (Black, J., concurring); New York Times, 376 U.S. at 297, 84 S.Ct. at 735 (Goldberg, J., concurring).
[5] Although the cases cited above were decided after 1889, they seem to accurately reflect the common law as it existed in 1889 and are therefore relevant to this factor. See State v. Russell, 125 Wash.2d 24, 60-61, 882 P.2d 747 (1994) (resorting to post-1889 law), cert. denied, ___ U.S. ___, 115 S.Ct. 2004, 131 L.Ed.2d 1005 (1995).
[6] Amici Curiae American Civil Liberties Union of Washington, Mothers Against Police Harassment, Loren Miller Bar Association, and Northwest Legal Foundation.
[7] An absolute privilege common law privilege applies in three general areas: (1) judicial proceedings, (2) legislative proceedings, and (3) acts of important government executives. Engelmohr v. Bache, 66 Wash.2d 103, 104, 401 P.2d 346, cert. dismissed, 382 U.S. 950, 86 S.Ct. 431, 15 L.Ed.2d 463 (1965). In these situations, "public service and administration of justice require complete immunity." Herron v. Tribune Publishing Co., 108 Wash.2d 162, 177, 736 P.2d 249 (1987) (quoting Bender v. Seattle, 99 Wash.2d 582, 600, 664 P.2d 492 (1983)). We also recognize an absolute privilege for statements made in the course of quasi-judicial proceedings when (1) compelling public policy necessitates an absolute privilege, and (2) then only when "authorities have the power to discipline as well as strike from the record statements which exceed the bounds of permissible conduct." Twelker v. Shannon & Wilson, Inc., 88 Wash.2d 473, 476, 564 P.2d 1131 (1977); see, e.g., Hurst v. Farmer, 40 Wash.App. 116, 697 P.2d 280 (statements made to EEOC in course of investigation absolutely privileged), review denied, 103 Wash.2d 1038 (1985).
[8] Jury Instruction No. 9 states in part: "The burden is on the Plaintiff to prove the first four of these elements [of defamation] by a preponderance of the evidence. With regard to the fifth element, actual malice, the Plaintiff has the burden of establishing by clear and convincing evidence that the publication was made with actual malice." Clerk's Papers at 820. Instruction 9 is nearly identical to the model federal instruction. See Edward J. Devitt et al., Federal Jury Practice and Instructions § 84.08 (4th ed.1987). Thompson also claims jury instruction 6 misstated the definition of "clear and convincing" evidence. We will not review this issue because it was not raised in the petition for review. RAP 13.7(b).
[9] Amicus Curiae American Civil Liberties Union of Washington (ACLU-W) calls this action "a SLAPP suit (Strategic Lawsuits Against Public Participation) designed to target or punish citizens who exercise their rights of free speech and petition." Brief of Amicus Curiae ACLU-W at 2; see generally David J. Abell, Exercise of Constitutional Privileges: Deterring Abuse of the First AmendmentStrategic Lawsuits Against Public Participation, 47 SMU L.Rev. 95 (1993).
[10] Jury instruction 13 directed the jury to presume Trooper Richmond has suffered damages if it found for him on his defamation claim.
[11] We also note that even though instruction 9 directed the jury to presume damages, the actual amount of damages was still left for jury determination.
[12] The trial court dismissed Trooper Richmond's malicious prosecution claim on the basis the State Patrol's investigation did not constitute a "prosecution" within the meaning of RCW 4.24.350.