[No. 58284-4-I.  Division One.  October 29, 2007.]

WILLIAM E. LIPSCOMB, *Appellant*, v. FARMERS INSURANCE
COMPANY OF WASHINGTON ET AL., *Respondents*.

*Janyce L. Fink* (of *Fink Law Group, PLLC*), for appellant.

*Thomas Lether* and *Eric J. Neal* (of *Cole Lether Wathen & Leid, PC*), for respondents.

¶1 AGID, J. — William Lipscomb appeals the trial court's order granting summary judgment for Farmers Insurance Company and insurance agent Dennis Dye. Lipscomb sued Farmers and Dye when Lipscomb's rental property burned and the insurance policy on the property did not adequately cover the damage. The trial court held that Lipscomb did not present sufficient facts to establish that Dye had a special relationship with Lipscomb that created a duty to ensure that he had adequate insurance coverage. Because the record does not contain facts indicating that Dye and Lipscomb even talked about the adequacy of his insurance coverage, we affirm.

## FACTS

¶2 William Lipscomb owned several properties and purchased insurance policies for those properties through an insurance agent, Thomas Nolan. In 1994, after purchasing a rental property, he contacted Nolan and asked him to recommend a property and liability policy for that property. To insure the rental property, Nolan procured a "Landlord Protector Package Policy" issued by Farmers Insurance Company of Washington, which carried a liability limit of $100,000. In 1996, Dennis Dye purchased Nolan's book of business, which included Lipscomb's accounts. When Dye took over Nolan's accounts, Dye did not review Lipscomb's policies on file, nor did Lipscomb request any changes be made to the policy.

¶3 On May 1, 2002, there was a fire on the rental property and the tenant's child Emily Woodrow, a 10 month old girl, was badly burned. The Woodrows sued Lipscomb, alleging that the smoke alarms did not warn the family in time to evacuate and that Lipscomb failed to comply with agreements to make certain repairs. The damages alleged far exceeded Lipscomb's liability policy limits.

¶4 Lipscomb then sued Farmers and Dye, alleging that they were negligent in failing to ensure that he had adequate insurance coverage. Specifically, Lipscomb alleged that Dye held himself out to be a highly skilled insurance adviser, that he relied on Dye to procure sufficient coverage, and that he did not seek increased coverage based on Dye's representations that it was adequate. Lipscomb also alleged claims of intentional and negligent emotional distress, negligent supervision, negligent hiring, and negligent retention.

¶5 Farmers and Dye moved for summary judgment, arguing they did not have a duty to advise Lipscomb to obtain higher liability limits because Dye did not have a special relationship with Lipscomb that created such a duty. In support of its motion, Farmers offered Dye's statements that he never spoke with Lipscomb. Lipscomb opposed the motion, arguing that a special relationship existed because there was a long-standing relationship between him and the agent, they discussed coverage limits, Dye assured him that he was adequately covered, and he relied to his detriment on that representation. Lipscomb offered his statements and the statements of his assistant Christina Wagar that they made several attempts to contact Dye, that they did in fact speak with him about the coverage of Lipscomb's properties, and that he never responded to their calls or their requests to provide copies of their current policies.

¶6 According to Lipscomb, he recalled speaking with Dye once when he telephoned Dye and told him he needed a clarification of what his coverages were for all of his

properties. Specifically, Lipscomb testified to the following at a deposition:

Q: I understand you represent you made attempts to [speak with Dye]. Did you ever actually speak to the man?

A: Just once, twice. I don't know. Yes, I spoke with the man. And insisted that, you know, I need to know what my coverages were, things like that. He never got back to me.

Q: When did you speak—

A: He told me I was covered.

Q: —to the man?

A: I shouldn't have to worry. I was covered, you know, and when he had find [sic] some time, he would get the stuff together for me.

Q: When did that—I'm assuming this was a phone conversation?

A: Yes.

Q: When did this phone conversation take place?

A: Prior to the fire.

Q: Do you know when? What year?

A: Probably within the year before the fire.

. . . .

Q: Okay. Was it a general, I need to know about my policies, or was it specifically relating to liability limits?

A: Overall.

Q: Overall. Okay. And what did he say in response?

A: He would try to work on it, get it put together for me and give me a call back.

Q: Did he say specifically what he was going to put together?

A: My insurance coverages.[1]

Lipscomb then testified that he understood this to mean that Dye would pull the policies on all of Lipscomb's properties, evaluate the policies, and give him a summary so he "knew where [he] stood."

---

[1] (Emphasis omitted.)

¶7 Lipscomb further testified that he had Wagar follow up on this but that she could never reach Dye at the office. Thus, to his knowledge, Lipscomb said that Wagar probably never discussed with Dye the policy limits on the Woodrow rental property. As he explained: "there would be no reason to because we're adequately insured, I mean. So she didn't get into that part of it. It's just, you know, she felt Farmers [is] insuring us, so they would never underinsure us. So we have a comfort[able] feeling."

¶8 According to Wagar's declaration, she first spoke to Dye in September 1999 and asked him about a premium that was due on another rental property owned by Lipscomb, the Park Forest Apartments. After giving him a check to renew that policy, she asked him to send her copies of all of Lipscomb's policies so she could make a payment schedule for them. Wagar never received copies of any of the policies. In November 1999, Wagar found the old expired policies for the Woodrow rental property and "filed them away." In September 2000, she again requested from Dye copies of the policies but did not receive anything.

¶9 On May 29, 2001, Wagar received a Farmers cancellation notice based on nonpayment of premiums for a policy on another property in Auburn Lipscomb owned. She contacted Dye's office, and his assistant told her that several of Lipscomb's policies had lapsed due to nonpayment of premiums. She delivered a check that day for all premiums due, and the assistant told her that the payment would bring all of the lapsed policies back into force. That same day, Wagar received a fax from Dye's office signed by Dye that contained a list of policy numbers and the corresponding properties with the words "in force" written next to each property.

¶10 In June 2001, there was a fire at the Park Forest Apartments rental property. Shortly after the fire, Wagar received a notice from the mortgagor that it had no proof of insurance on the Park Forest Apartments and other properties that were listed on the May 2001 fax from Dye as being "in force." She then called Dye, but he did not return

her calls. On June 25, 2001, she received a fax from Dye's office informing Lipscomb that it was no longer insuring apartment complexes and that four of six listed properties would be ineligible for coverage as of the date of the policy expiration, which was May 2001.

¶11 Wagar and Lipscomb eventually spoke with Dye, and according to Wagar, he agreed that they had a legitimate complaint about his failure to notify them that four of the six policies that were supposedly in force were not. He also initially told her that his "hands were tied" and that there was nothing he could do for Lipscomb. But in July 2001, Lipscomb received an insurance check for the loss claimed at the Park Forest Apartments.

¶12 The trial court granted summary judgment for Farmers, finding that there were insufficient facts to establish that there was a special relationship between Lipscomb and Dye that created a duty for Dye to advise Lipscomb to increase his policy limits. Specifically, the court found that there was no evidence that Dye held himself out as a specialist and received additional compensation, that there was a long-standing relationship between Lipscomb and Dye, or that Lipscomb ever asked for advice about his coverage options. The court further found that Lipscomb failed to demonstrate detrimental reliance. The court dismissed the remaining claims of emotional distress and negligent hiring, retention, and supervision because Lipscomb did not respond to Farmers' motion for summary judgment on these claims. Lipscomb filed a motion to reconsider the court's summary judgment ruling, which was denied.

## DISCUSSION

¶13 Lipscomb argues that the trial court erred by granting summary judgment because there were genuine issues of material fact about (1) whether he and Agent Dye had a special relationship that gave rise to a duty to ensure that Lipscomb had adequate insurance coverage, (2) whether

Farmers and Agent Dye breached this duty, and (3) whether Farmers was vicariously liable for Agent Dye's actions. He further argues that the trial court abused its discretion by denying his motion to reconsider the summary judgment ruling. Farmers cross-appeals, contending that the trial court erred by denying its motion to strike declarations offered by Lipscomb in support of his opposition to the summary judgment motion.

## I. *Special Relationship and the Duty To Adequately Insure*

■ ¶14 We review summary judgment orders de novo and engage in the same inquiry as the trial court.[2] We will affirm a summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[3] We construe the facts and all reasonable inferences from those facts in the light most favorable to the nonmoving party.[4]

■ ¶15 A "material fact" is a fact upon which the outcome of the litigation depends.[5] The burden is on the moving party to present facts showing there is no issue of material fact.[6] The nonmoving party must set forth specific facts that demonstrate a genuine issue of material fact and cannot rest on mere allegations.[7] "When a nonmoving party fails to controvert relevant facts supporting a summary judgment motion, those facts are considered to have been established."[8]

---

[2] *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006).

[3] CR 56(c); *Huff v. Budbill*, 141 Wn.2d 1, 7, 1 P.3d 1138 (2000).

[4] *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

[5] *Balise v. Underwood*, 62 Wn.2d 195, 199, 381 P.2d 966 (1963).

[6] *Young v. Key Pharms.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

[7] CR 56(e); *Baldwin v. Sisters of Providence, Inc.*, 112 Wn.2d 127, 132, 769 P.2d 298 (1989).

[8] *Cent. Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 354, 779 P.2d 697 (1989) (citing *Wash. Osteopathic Med. Ass'n v. King County Med. Serv. Corp.*, 78 Wn.2d 577, 579, 478 P.2d 228 (1970)).

¶16 For a claim of negligence, the plaintiff must establish duty, breach, causation, and damages.[9] "The existence of a duty is a question of law for the court, to be considered in light of public policy considerations."[10] In the insurance context, an agent does not have a duty to procure a policy that affords the client complete liability protection.[11] But such a duty may arise when there is a special relationship between the agent and the insured.[12]

¶17 A special relationship exists if (1) the agent holds himself out as an insurance specialist and receives additional compensation for consulting and advice or (2) there is a long-standing relationship, some type of interaction on the question of coverage, and the insured relied on the agent's expertise to the insured's detriment.[13] In *AAS-DMP Management, LP v. Acordia Northwest, Inc.*,[14] the court applied these factors and held that there was a special relationship between an insured and a broker. There, the broker had been the insured's broker for between 10 and 15 years; the broker sold maritime insurance, which was a specialized and complex area of insurance; the broker managed all of the insured's policies; the broker and the insured spoke almost daily about insurance and insurance risk matters; and the broker traveled to London to negotiate the policy at issue with an underwriting syndicate. But in cases where the insured never consulted with the agent about the adequacy of coverage and the agent never gave

---

[9] *Crowe v. Gaston*, 134 Wn.2d 509, 514, 951 P.2d 1118 (1998).

[10] *Suter v. Virgil R. Lee & Son, Inc.*, 51 Wn. App. 524, 528, 754 P.2d 155 (citing *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 933, 653 P.2d 280 (1982)), *review denied*, 111 Wn.2d 1005 (1988).

[11] *Id.* (quoting *Jones v. Grewe*, 189 Cal. App. 3d 950, 234 Cal. Rptr. 717, 720 (1987), *review denied*, May 14, 1987); *Gates v. Logan*, 71 Wn. App. 673, 677-78, 862 P.2d 134 (1993), *review denied*, 123 Wn.2d 1026 (1994).

[12] *Suter*, 51 Wn. App. at 528; *Gates*, 71 Wn. App. 677-78.

[13] *Suter*, 51 Wn. App. at 528; *Gates*, 71 Wn. App. at 677.

[14] 115 Wn. App. 833, 840, 63 P.3d 860, *review denied*, 150 Wn.2d 1011 (2003).

any advice, courts have held that no special relationship exists.[15]

¶18 Here, the record does not support a finding of a special relationship. There was no evidence that Dye held himself out as an expert or received extra compensation. Nor did Lipscomb establish that he had a long-standing relationship with Dye or that they actually discussed the adequacy of his policy limits. In fact, there is nothing in the record to indicate that Lipscomb had any contact with Dye when he took over Nolan's accounts. At most, the record shows that Lipscomb and his assistant made repeated requests for copies of his policies to which Dye did not respond, and that Lipscomb had one phone conversation with Dye about his policies sometime within a year before the fire.

¶19 Lipscomb points to that phone conversation as evidence that they had an "interaction on the question of coverage" and thereby created a special relationship. According to Lipscomb, in that conversation, he told Dye he needed to know what his coverages were, Dye told him he "was covered," and Dye told him that he would work on "put[ting] together" Lipscomb's coverages. While Lipscomb stated that it was his "understanding" that Dye would pull all of his policies, evaluate them, and give him a summary so he knew where he stood, he never stated that Dye actually told him this. Thus, this evidence does not establish that they discussed the adequacy of coverage. By telling Dye he needed to know what his coverages were, Lipscomb did not request advice about whether he should increase his policy limits or otherwise change his coverage; he simply asked for verification of current coverage.

¶20 Lipscomb further fails to show that he relied on Dye's expertise to his detriment. Here, Dye's "expertise" was limited to telling Lipscomb that he "was covered." While admittedly vague, this statement was not necessarily misleading or erroneous: Lipscomb *did* have coverage, at

---

[15] *See Suter*, 51 Wn. App. at 529; *Gates*, 71 Wn. App. at 677-78.

least for the Woodrow rental property, which is the property at issue here. Whether this coverage adequately addressed his needs was another question, but it was one Lipscomb did not ask. In fact, viewing the conversation in context of the record as a whole, it makes sense that Lipscomb was asking only about the fact of coverage, not the extent of it, because he had a problem earlier when coverage actually lapsed because Farmers did not send him and his mortgage company renewal notices. Thus, unlike in *Acordia* where the broker managed all of the insured's policies for 10-15 years, spoke daily with the insured about insurance risk matters, and actually negotiated the policy at issue, this single conversation between Dye and Lipscomb about his "coverages" is hardly sufficient "interaction on the question of coverage" to establish a special relationship and create a duty to ensure that Lipscomb had adequate coverage.

¶21 Lipscomb argues that this court's decision In *Shah v. Allstate Insurance Co.*[16] is controlling and resolves the issue in his favor. In *Shah*, the trial court dismissed on summary judgment the Shahs' negligence claim alleging that the insurance agent failed to advise the Shahs that they did not have adequate coverage for their property and negligently misrepresented that the policy limits covered replacement value.[17] Damage caused by a fire on the property exceeded the policy limits, which the agent had assured them were high enough to cover the replacement value.[18] The trial court assumed for purposes of the summary judgment motion that the agent breached a duty and found that as a matter of law, the Shahs failed to establish the negligent misrepresentation claim because they knew what the policy limit was and therefore did not reasonably rely on the agent's representations.[19] The court further found that the Shahs failed to show proximate cause

---

[16] 130 Wn. App. 74, 121 P.3d 1204 (2005), *review denied*, 157 Wn.2d 1006 (2006).

[17] *Id.* at 77.

[18] *Id.* at 77, 80.

[19] *Id.* at 79-80.

because their judgment/business decision to accept the policy was an intervening cause.[20]

¶22 This court reversed and held that there were genuine issues of material fact about whether the agent was negligent by failing to advise the Shahs that they had inadequate coverage.[21] The court held there was an issue of material fact about whether the agent breached this duty because the agent assured the Shahs that the policy was for replacement cost, even though the property was actually insured for a much lower amount.[22] The court also held that there was an issue of material fact about whether the Shahs knew they had adequate coverage and whether the agent's acts caused the Shahs to keep their policy low because they contended they would have increased their coverage had they been properly informed.[23]

¶23 On the negligent misrepresentation claim, the court held there were genuine issues of material fact about whether the Shahs justifiably relied on the agent's assurances that the policy was adequate.[24] The court cited the following evidence offered by the Shahs: they had discussed with the agent why the policy was so low compared to quotes they received from other insurance companies, the agent told them it was the replacement value and they need not worry, the agent had known the Shahs for 20 years and created policies for their children, and the agent had made recommendations before about adequate insurance coverage.[25] Thus, the court concluded that "[d]ue to the Shahs' long-standing relationship with [the agent] and their historic reliance upon him for their insurance coverage needs,"

---

[20] *Id.*

[21] *Id.* at 83.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 85.

[25] *Id.* at 84-85.

there was an issue of material fact about whether the insured's reliance on the agent's statement was justified.[26]

¶24 Lipscomb argues that as in *Shah*, here there was an issue of material fact about whether he actually knew he had inadequate coverage and whether he made a conscious choice to keep it low. But in *Shah*, the insureds actually asked the agent why their limit was so low, and the agent erroneously told them that it was the replacement cost. Here, the record indicates that Lipscomb did not question his policy limits; he questioned only whether he was in fact covered. Thus, at most, the facts contained in the record create an issue as to whether Lipscomb believed he had coverage, not whether he believed he had adequate coverage. Whether he believed he had coverage is not a factual issue that is material to establishing that Dye had a duty to adequately insure the property; only the insured's beliefs about the *adequacy* of the coverage is relevant to this determination.[27] It therefore does not preclude summary judgment. Finally, unlike in *Shah*, the facts here did not establish that there was a long-standing relationship between Lipscomb and Dye and that Lipscomb "historically relied" on the agent's representations.

## II. *Vicarious Liability*

¶25 Lipscomb also argues that summary judgment was erroneous because there were issues of material fact about whether Farmers was vicariously liable for injuries caused by Dye's negligence. But as Farmers correctly points out, Lipscomb did not raise this issue in the trial court. Lipscomb's complaint alleged negligence in Farmers' hiring, supervision, and retention of Dye; negligence in failing to properly insure; intentional infliction of emotional distress; and negligent infliction of emotional distress. The complaint did not contain any allegations of vicarious

---

[26] *Id.* at 85.

[27] *See Suter*, 51 Wn. App. at 529; *Shah*, 130 Wn. App. at 84-85.

liability.[28] Significantly, Lipscomb did not address in his reply brief Farmers' argument that he waived this issue on appeal by failing to raise it in the trial court.

¶26 This court ordinarily will not consider issues raised for the first time on appeal unless they involve a manifest error affecting a fundamental constitutional right.[29] Lipscomb does not identify an error affecting a fundamental constitutional right but simply asserts that Farmers' is vicariously liable for injuries caused by Dye's negligence. Thus, this issue is not properly before us, and we decline to consider it.

### III. *Motion To Reconsider*

¶27 Finally, Lipscomb challenges the trial court's denial of his motion to reconsider the summary judgment ruling. As Farmers points out, Lipscomb assigned error to the court's ruling but did not address this issue in his opening brief. He raises it only in the reply brief. Thus, we decline to consider this issue.[30] Even if we were to consider it, the argument in the reply brief does not raise any new issues; it simply reiterates the arguments made in the opening brief that there were issues of material fact that precluded summary judgment. As discussed above, these arguments are without merit.[31]

### IV. *Cross-Appeal*

¶28 On cross-appeal, Farmers argues that the trial court abused its discretion by failing to strike (1) the declarations

---

[28] During oral argument on the summary judgment, there was a brief mention of the possibility of amending the complaint to include this cause of action, but Lipscomb never filed the amendment.

[29] RAP 2.5; *Richmond v. Thompson*, 130 Wn.2d 368, 384-85, 922 P.2d 1343 (1996).

[30] *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (issue argued for first time in reply brief is "too late to warrant consideration").

[31] The motion to reconsider also provided a citation to Lipscomb's deposition testimony that counsel was unable to cite at the time of the trial court's ruling. But as discussed above, this testimony did not establish that Dye discussed the adequacy of his coverage.

of experts who gave opinions on the standard of care for insurance agents, (2) portions of Wagar's declaration that were based on hearsay and documents that were not in the record, and (3) references to the acts or omissions of Dye's predecessor, Agent Nolan. But at oral argument, counsel for Farmers conceded that these rulings were within the discretion of the trial court and agreed that these issues need not be reached if the summary judgment is affirmed. Because we affirm the trial court's summary judgment ruling, we do not address the issues raised in the cross appeal.

## V. *Fees and Costs*

¶29 Farmers requests attorney fees and costs pursuant to RAP 18.9. Farmers acknowledges that the trial court did not find Lipscomb violated CR 11 but argues that it is entitled to reasonable costs and fees because Lipscomb's causes of action were "entirely without merit" and "interposed for improper purposes and without reasonable investigation." Farmers further asserts that by appealing the trial court's correct dismissal of those causes of action, Lipscomb caused Farmers to incur even more costs and fees to respond to these "meritless allegations."

¶30 RAP 18.9 addresses "Violation of Rules" and provides for sanctions as follows:

> **(a) Sanctions.** The appellate court on its own initiative or on motion of a party may order a party or counsel, or a court reporter or other authorized person preparing a verbatim report of proceedings, who uses these rules for the purpose of delay, files a frivolous appeal, or fails to comply with these rules to pay terms or compensatory damages to any other party who has been harmed by the delay or the failure to comply or to pay sanctions to the court. The appellate court may condition a party's right to participate further in the review on compliance with terms of an order or ruling including payment of an award which is ordered paid by the party. If an award is not paid within the time specified by the court, the appellate court will transmit the award to the superior court of the county where

the case arose and direct the entry of a judgment in accordance with the award.

¶31 Farmers does not identify the specific rule violation in RAP 18.9 that serves as the basis for its request for sanctions/fees, but it appears that Farmers is arguing that Lipscomb filed a frivolous appeal. While Farmers is correct that the trial court dismissed Lipscomb's causes of action for emotional distress and negligent hiring, retention, and supervision because Lipscomb failed to argue against dismissal, these claims were not the subject of this appeal. The issues Lipscomb raises on appeal are whether a duty existed and whether Lipscomb reasonably relied on Dye's representations and were related to the remaining negligence claims. As the trial court noted, these issues were the "most troubling or most difficult," and the parties "appropriately" spent most of their time arguing these issues. Thus, we cannot hold that Lipscomb filed a frivolous appeal. Lipscomb appropriately raised these issues in the trial court, and we do not conclude that he was frivolous by pursuing them on appeal. Farmers therefore fails to provide a basis for its request for fees and costs.

¶32 We affirm.

COLEMAN and BAKER, JJ., concur.