225 P.3d 1012 (2008)
148 Wash.App. 264
Sharon R. REED, Respondent,
v.
ANM HEALTH CARE and Karen E. Hulley, individually and as defendants' agent, Petitioners.
No. 60747-2-I.
Court of Appeals of Washington, Division 1.
December 8, 2008.
Publication Ordered January 12, 2009.
Kerry Berry Wick, Seattle, WA, for appellant ANM Health Care.
Pamela Marie Andrews, Seattle, WA, for appellant Karen Hulley.
Andrew George Cooley, Seattle, WA, for appellant University of Washington Medical Center.
Judith Lonnquist, Mitchell Riese, Wendy Leigh Lilliedoll, Seattle, WA, for respondent Sharon R. Reed.
LAU, J.
¶ 1 Sharon Reed was barred from her life partner's intensive care unit hospital room for extended periods of time on the night before her partner's death. Karen Hulley, the critical care nurse who limited Reed's visitation, asserts that her actions were medically motivated, but Reed challenges this assertion. Reed brought an action against Hulley for the common law torts of outrage and negligent infliction of emotional distress. Hulley argues that Reed's alleged injuries occurred as a result of health care, so her remedies are limited by RCW 7.70.010, and that she has no viable claim under chapter 7.70 RCW. But we conclude that Reed presented a genuine factual dispute regarding whether her injuries resulted from health care. Accordingly, we affirm the trial court's denial of summary judgment.

FACTS
¶ 2 Sharon Reed and Jo Ann Ritchie were life partners for 17 years before Ritchie's death. Ritchie was ill for several years before she died and had been hospitalized several times. Ritchie executed a durable power of attorney giving Reed authority to make medical care decisions on Ritchie's behalf.[1] The document also authorized Reed "[t]o provide for companionship for me and to be accorded the status of a family member for purposes of visitation" and "to provide for such companionship for me as will meet my needs and preferences at a time when I am disabled or otherwise unable to arrange for such companionship." Clerk's Papers (CP) at 277.
¶ 3 Reed brought her partner to the University of Washington Medical Center on August 30, 2005, because Ritchie was having *1013 trouble breathing. From August 30 to September 3, Reed and Ritchie's family had unrestricted access to Ritchie. Around 4 p.m. on September 3, Ritchie was admitted to the Intensive Care Unit ("ICU"). According to Reed, Ritchie told her, "I'm scared. Don't leave me." CP 268. Between the time when Ritchie was admitted to the ICU and approximately 11 p.m., Reed and others were permitted to be at Ritchie's bedside, two at a time. At about 11 p.m., Dr. Dong Chang, the treating pulmonologist, discussed Ritchie's condition with Reed and Ritchie's sister, Betty Hanson. Dr. Chang advised them that the situation was grave, but that he was hopeful Ritchie would live through the night. According to Reed, Dr. Chang told her that she could continue to stay with Ritchie in her room, which was consistent with her prior experiences during Ritchie's illness.
¶ 4 Karen Hulley, the critical care nurse assigned to Ritchie, began her shift at 7 p.m. on September 3. Shortly after 11 p.m., Hulley told Reed she would have to leave Ritchie's room. According to Hulley, she asked Reed to call her from the waiting area before coming back to Ritchie's room. Hulley claims that Reed repeatedly re-entered the room without calling first and that Reed interfered with Ritchie's rest by talking to her and touching her. Hulley contends that Reed was agitating Ritchie and compromising her respiratory status and that her oxygen status was very unstable. Hulley says she applied an oxygen mask to Ritchie and gave her frozen plasma with the goal of stabilizing her for a possible life-prolonging surgery. Hulley alleges that she gave Reed updates on Ritchie's status over the phone and in person and there were times when she had to physically work around Reed to tend to Ritchie.
¶ 5 Reed disputes Hulley's version of events. She contends that Hulley never updated her or told her to call before entering Ritchie's room. Reed contends that Hulley never expressed concern that she was agitating Ritchie. According to Reed, she consistently encouraged her partner to not try to speak and Ritchie was comforted by her presence, not agitated. Reed also claims that she saw Hulley "roughly shoving a bed pan" under Ritchie and when she offered to help, Hulley yelled at her to get out. CP at 269. Reed asserts that when she told Hulley about her power of attorney, Hulley responded that it did not matter. Reed was distraught at the thought that Ritchie might die alone. Hulley's shift ended at 7 a.m. Reed was permitted to rejoin Ritchie, but at that point Ritchie was "in an extremely drugged state." Life-prolonging measures were no longer possible, and Ritchie died a few hours later.
¶ 6 Reed filed suit against Hulley, Hulley's nurse placement agency (ANM Health Care) and the University of Washington Medical Center.[2] She asserted claims for outrage and negligent infliction of emotional distress based on Hulley's decision to exclude her from Ritchie's room. Hulley moved for summary judgment and submitted a declaration from a registered nurse opining that Hulley's exclusion of Reed was medically proper and fell within the standard of care for an ICU nurse. Hulley argued that Reed's alleged injuries occurred as a result of health care, so her remedies were limited by RCW 7.70.010 and that she had no viable claim under chapter 7.70 RCW. The trial court denied the motion, and this court granted discretionary review.

ANALYSIS
¶ 7 Hulley contends that the trial court erred in denying her summary judgment motion. She argues that Reed's injuries arose from the provision of health care, so her remedies are limited to those provided in chapter 7.70 RCW. Reed argues that Hulley's actions were not motivated by her health care judgment. Consequently, Reed contends that her injuries did not occur as a result of health care and RCW 7.70.010 does not preclude her common law tort claims.
¶ 8 An appellate court reviewing a trial court's denial of summary judgment makes the same inquiry as the trial court. Hertog *1014 v. City of Seattle, 138 Wash.2d, 265, 275, 979 P.2d 400 (1999). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Hertog, 138 Wash.2d at 275, 979 P.2d 400. Facts and reasonable inferences are considered in the light most favorable to the nonmoving party, and questions of law are reviewed de novo. Berger v. Sonneland, 144 Wash.2d 91, 102-03, 26 P.3d 257 (2001).
¶ 9 In 1976, the legislature preempted "[a]ll civil actions and causes of action, whether based on tort, contract, or otherwise, for damages for injury occurring as a result of health care." RCW 7.70.010. To recover for an injury occurring as a result of health care, a plaintiff must establish one of the following:
(1) That injury resulted from the failure of a health care provider to follow the accepted standard of care;
(2) That a health care provider promised the patient or his representative that the injury suffered would not occur;
(3) That injury resulted from health care to which the patient or his representative did not consent.
RCW 7.70.030. Thus, whenever an injury occurs as a result of health care, an action for damages is governed exclusively by chapter 7.70 RCW and to be actionable, the injury must fall within one of the three categories of RCW 7.70.030. Branom v. State, 94 Wash. App. 964, 969, 974 P.2d 335 (1999).
¶ 10 But not all actions that occur during the course of a health care provider and patient relationship constitute "health care" within the meaning of the statute. Estate of Sly v. Linville, 75 Wash.App. 431, 438, 878 P.2d 1241 (1994). For example, in Sly, the plaintiff sued Dr. Linville for misrepresenting the nature and extent of his prior physician's negligence. Sly, 75 Wash.App. at 434, 878 P.2d 1241. Sly argued that he failed to timely bring a medical malpractice action against his prior physician because of Dr. Linville's misrepresentations and that the tort of misrepresentation is separate and distinct from a medical malpractice claim. Sly, 75 Wash.App. at 434, 439, 878 P.2d 1241. The court agreed that the alleged misrepresentations were not health care because they were not part of Dr. Linville's treatment of Sly. Sly, 75 Wash.App. at 440, 878 P.2d 1241. To support its conclusion, the court cited a New York case in which a doctor had disclosed confidential information to his patient's employer.
Although in a general sense a doctor furnishes medical care to patients, clearly not every act of negligence toward a patient constitutes medical malpractice. The gravamen of plaintiff's complaint in the instant action is not defendants' malpractice in furnishing medical treatment to him, but rather defendants' failure in fulfilling his independent duty not to disclose confidential information without plaintiff's consent. Defendants' alleged breach of this duty did not arise during the process in which Dr. Ginsberg was utilizing the skills which he had been taught in examining, diagnosing, treating or caring for the plaintiff as his patient.
Sly, 75 Wash.App. at 439, 878 P.2d 1241 (emphasis in original) (quoting Tighe v. Ginsberg, 146 A.D.2d 268, 271, 540 N.Y.S.2d 99 (1989)).
¶ 11 A doctor's "entrepreneurial activities" also fall outside the ambit of "health care." Quimby v. Fine, 45 Wash.App. 175, 180-81, 724 P.2d 403 (1986). This is analogous to the area of legal services, where claims for legal negligence are separate from claims based on "'how the price of legal services is determined, billed, and collected and the way a law firm obtains, retains and dismisses clients.'" Quimby, 45 Wash.App. at 180, 724 P.2d 403 (quoting Short v. Demopolis, 103 Wash.2d 52, 61, 691 P.2d 163 (1984)). A claim based on legal incompetence is exempt from the Consumer Protection Act, but a claim based on how the legal services provider conducts business is not. Quimby, 45 Wash.App. at 180, 724 P.2d 403. Likewise, in the medical arena, if a doctor is motivated to promote an unnecessary surgery for financial gain, an injured plaintiff can pursue a claim under the Consumer Protection Act. Quimby, 45 Wash.App. at 181, 724 P.2d 403. See also Wright v. Jeckle, 104 Wash.App. 478, 485, 16 P.3d 1268 (2001) (permitting a Consumer Protection Act claim against a *1015 doctor independent of chapter 7.70 RCW because the conduct complained of was not the manner in which the doctor practiced medicine but rather how he engaged in "the business of selling diet drugs").
¶ 12 The key question in determining whether an injury occurs as a result of health care is whether the injury occurs during "`the process in which [a medical professional is] utilizing the skills which [the professional has] been taught in examining, diagnosing, treating or caring for'" the patient. Branom, 94 Wash.App. at 969-70, 974 P.2d 335 (quoting Sly, 75 Wash.App. at 439, 878 P.2d 1241). Thus, when the conduct complained of is part of the health care provider's efforts to treat and care for a patient's medical needs, the injury occurs as a result of health care and the claim falls under chapter 7.70 RCW. For example, in Berger, the court concluded that the physician's disclosure of confidential information to the plaintiff's former husband was "health care" because the reason the physician disclosed the information was to learn more about the plaintiff's prior use of pain medication, which could enable him to more effectively treat, diagnose, and care for her. Berger, 144 Wash.2d at 110, 26 P.3d 257; compare Tighe, 540 N.Y.S.2d at 99 (where physician's disclosure of confidential information to plaintiff's employer, for whom physician had testified as an expert witness, gave rise to tort claim separate and distinct from medical malpractice). Similarly, in Branom, the court concluded that allegedly insufficient medical advice fell within the rubric of health care because the advice was given as part of the doctor's efforts to treat, diagnose, and care for his patient. Branom, 94 Wash.App. at 970-71, 974 P.2d 335.
¶ 13 Here, the issue is whether Hulley's decision to exclude Reed was part of her efforts to treat and care for Ritchie or whether the exclusion was motivated by something other than her medical judgment. If the exclusion was to address Ritchie's medical needs, then Reed's injuries occurred as a result of health care and her common law tort claims are precluded by RCW 7.70.010 and .030. If the exclusion was not based on Ritchie's medical needs, then Reed's common law tort claims remain viable.
¶ 14 We agree that Reed presented sufficient evidence to create a genuine factual dispute regarding Hulley's motivations for excluding Reed. She points out that Dr. Chang told her that she could stay with Ritchie and that no other hospital personnel had ever restricted her access to Ritchie as Hulley did. According to Reed, Hulley's demeanor towards her was extremely hostile even though she had done nothing to make Hulley angry. Reed also claims that she saw Hulley "roughly shoving a bed pan" under Ritchie and when she offered to help, Hulley yelled at her to "get out." Hulley disputes this, insisting that she did not raise her voice at Reed, but given the procedural posture of this case, we must view the evidence and all reasonable inferences therefrom in the light most favorable to Reed. Lipscomb v. Farmers Ins. Co. of Wash., 142 Wash.App. 20, 27, 174 P.3d 1182 (2007).
¶ 15 Hulley offers a medical justification for the exclusionthe need to stabilize Ritchie for a possible life-prolonging procedure.[3] She alleges that she observed a negative impact on Ritchie's respiratory status during Reed's visits because Reed would talk to Ritchie instead of letting her rest. But this observation is not documented in her contemporaneous chart notes and is disputed by Reed. Reed claims that Ritchie was comforted by her presence, not agitated, and that Hulley's statement to the contrary is nothing more than a post hoc rationalization. According to Reed, requiring her to leave her partner's room actually increased Ritchie's anxiety and agitation. Hulley emphasizes that the only expert opinion in the record states that her conduct fell within the accepted standard of care for a reasonably prudent nurse under the circumstances. But this case is not about whether Hulley's decision to *1016 exclude Reed breached the standard of care. Rather, as discussed above, the critical question is whether Hulley's actions in excluding Reed were medically motivated. Hulley also fails to acknowledge the disputes about whether she updated Reed on Ritchie's status or told her to call before entering Ritchie's room.
¶ 16 We conclude that the disputed evidence creates genuine material issues of fact that preclude summary judgment. Here, Reed points to specific facts in the record from which a reasonable jury could infer that Hulley's decision to exclude Reed was motivated by reasons other than her medical judgment. Because Reed presented a genuine issue of material fact, the trial court's denial of summary judgment was proper.
¶ 17 Affirmed.
NOTES
[1] Ritchie also made Reed the personal representative of her estate, but Reed brings this action solely on her own behalf.
[2] The University of Washington Medical Center's motion for summary judgment dismissal was granted, and it is not a party to this appeal.
[3] During oral argument, Reed's attorney argued that the medical evidence in the record does not establish that such a procedure was scheduled to occur. But our review of the record suggests that a thoracentesis procedure may have been contemplated as part of the plan to care for Ritchie. See CP at 361 (noting that Ritchie "was anxious r/t placing piv, checking INR, rec'g FFP and thoracentesis").